UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


TIMOTHY DAVID MURPHY,

          Petitioner,

                                       CASE NO. 97-CV-76017-DT

v.                                   JUDGE AVERN COHN

                                       MAGISTRATE JUDGE PAUL J. KOMIVES

FRANK ELO,

          Respondent.
_____/


## REPORT AND RECOMMENDATION

I.    RECOMMENDATION ................................................ 2
II.   REPORT ........................................................ 2
    A.   *Procedural History* ........................................ 2
    B.   *Factual Background Underlying Petitioner's Conviction* ............... 6
    C.   *Procedural Default* ........................................ 8
    D.   *Standard of Review* ....................................... 12
    E.   *DNA Evidence (Claim I)* .................................... 14
        1.   *Clearly Established Law* ............................... 14
        2.   The *Davis/Frye* Standard ............................. 15
        3.   *The DNA Evidence and State Court Proceedings* ............. 17
        4.   *Analysis* ........................................ 20
    F.   *Ineffective Assistance of Counsel (Claims II & VI)* .................. 22
        1.   *Clearly Established Law* ............................... 22
        2.   *Analysis* ........................................ 23
            a. Failure to Seek Complete Discovery ................... 23
           b. Failure to Object to Prosecutorial Misconduct ............ 25
           c. Failure to Investigate/Present Alibi Witness .............. 25
           d. Failure to Object to Jury Taint ...................... 26
           e. Appellate Counsel ............................... 30
    G.   *Prosecutorial Misconduct (Claim III)* ........................... 30
        1.   *Clearly Established Law* ............................... 31
        2.   *Analysis* ........................................ 31
            a. Vouching for DNA Evidence ........................ 31
           b. Vouching for Credibility of Police Investigators ........... 32
           c. Arguing Facts Not in Evidence ...................... 33
           d. Shifting Burden of Proof .......................... 36
    H.   *Pretrial Delay (Claim IV)* .................................. 37
        1.   *Clearly Established Law* ............................... 37
        2.   *Analysis* ........................................ 37
    I.   *Cumulative Error (Claim V)* ................................. 39
    J.   *Conclusion* ............................................. 40
III.  NOTICE TO PARTIES REGARDING OBJECTIONS ................... 40

I.      RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus.

II.     REPORT:

A.      *Procedural History*

1.      Petitioner Timothy David Murphy is a state prisoner, currently confined at the Kinross Correctional Facility in Kincheloe, Michigan.

2.      On October 10, 1991, petitioner was convicted of two counts of first degree criminal sexual conduct, MICH. COMP. LAWS § 750.520b; two counts of second degree criminal sexual conduct, MICH. COMP. LAWS § 750.520c; one count of breaking and entering an occupied dwelling with intent to commit a felony therein, MICH. COMP. LAWS § 750.110a; and one count of unarmed robbery, MICH. COMP. LAWS § 750.530, following a jury trial in the Saginaw County Circuit Court. Petitioner subsequently pleaded guilty to being an habitual offender, fourth offense.  On November 4, 1991, he was sentenced to a four terms of life imprisonment on the criminal sexual conduct convictions, and to two terms of 40-60 years' imprisonment on the breaking and entering and unarmed robbery convictions.

3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claim:

> BECAUSE THERE WERE NO GENERALLY ACCEPTED SCIENTIFIC STANDARDS OF POPULATION STATISTICS AT THE TIME OF TRIAL WHICH TOOK PLACE BEFORE NRC STANDARDS WERE APPROVED AND THERE CONTINUES TO BE NO ACCEPTED PEER REVIEW AMONG GENETICISTS OF DNA STATISTICAL EVIDENCE, MUST A NEW TRIAL BE ORDERED?

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. Murphy*, No. 147066 (Mich. Ct. App. Feb. 27, 1996) [hereinafter "Ct. App. op."].

4.      Petitioner sought leave to appeal this issue to the Michigan Supreme Court.  The Supreme Court denied petitioner's application for leave to appeal in a standard order.  *See People v. Murphy*, 454 Mich. 856, 558 N.W.2d 732 (1997).

5.      On November 24, 1997, petitioner, proceeding *pro se*, filed an application for the writ of habeas corpus, raising the single claim that he raised in the state courts.  On June 3, 1998, petitioner filed a motion for a continuance or stay so that he could raise and exhaust in the state courts additional claims alleging ineffective assistance of trial and appellate counsel, prosecutorial misconduct, and judicial misconduct.  On October 5, 1998, I filed a Report in which I recommended that the Court construe petitioner's motion as a motion to amend and a motion for continuance.  I recommended that the Court grant the motion to amend, deny the motion to stay, and dismiss the petition without prejudice for lack of exhaustion on the newly added claims.  The Court adopted my Recommendation on November 19, 1998.

6.      Petitioner thereafter filed a motion for relief from judgment in the trial court pursuant to MICH. CT. R. 6.500-.508, raising various claims of ineffective assistance of trial and appellate counsel, prosecutorial misconduct, and judicial misconduct.  The trial court found that plaintiff had demonstrated good cause for failing to raise these claims on direct appeal, but that the claims were without merit.  *See People v. Murphy*, No. 90-004292-FC-2 (Saginaw County, Mich., Cir. Ct. Sept. 10, 1999) [hereinafter "Trial Ct. op."].  Petitioner's applications for leave to appeal were denied by the Michigan Court of Appeals and the Michigan Supreme Court in standard orders.  *See People v. Murphy*, No. 224724 (Mich. Ct. App. Sept. 1, 2000); *People v. Murphy*, 465 Mich. 878, 636 N.W.2d 135 (2001).

7.      Petitioner subsequently filed a motion for relief from judgment in this Court pursuant

3

to FED. R. CIV. P. 60(b), asking the Court to vacate its order of dismissal and reinstate his habeas

action.  The Court granted petitioner's motion on October 17, 2001.

      8.      On October 16, 2001, petitioner filed an amended application for the writ of habeas

corpus, asserting the following claims:

I.      Because there [was] no generally accepted scientific standards of population statistics at the time of trial which took place before NRC standards were approved that Petitioner is entitled to a new trial.

II.      Petitioner was deprived of his Sixth and Fourteenth Amendment Constitutional right to the effective assistance trial counsel where counsel:

      A.      Failed to seek complete and adequate discovery;

      B.      Failed to properly investigate the case and the fact that someone other than Petitioner committed the crime as a defense at trial;

      C.      Failed to object or request curative instructions when the prosecutor made a series of improper and prejudicial comments during trial and closing arguments;

      D.      Failed to investigate Petitioner's alibi defense by neglecting to interview a single witness and failed to subpoena alibi witness Joyce Iagaz to testify at trial and;

      E.      Failed to object when Juror Krantz made a statement that tainted the jury and prejudiced petitioner.

III.      Petitioner was denied his right to a fair and impartial trial as guaranteed by the due process clause of the United States Constitutional Amendments Five and Fourteen because of prosecutor misconduct when the prosecutor:

      A.      Vouched for the credibility of DNA evidence during closing arguments;

      B.      Vouched for the credibility of the police, the police investigations, and the police doing "Good Police Work" on the case during closing arguments;

      C.      Argued facts to the jury that were never testified to by any witness and;

    D.    Attacked Petitioner's use of the alibi defense by questioning to the jury why Petitioner did not produce other witnesses to testify at trial thereby shifting the burden of proof.

IV.    Petitioner was denied his Fifth and Fourteenth Amendment Constitutional rights to due process where the state intentionally delayed the arrest of Petitioner for 155 days to gain a tactical advantage and then misled the trial court in their explanation of the delay causing actual and substantial prejudice to petitioner.

V.    Petitioner was deprived of his Fifth, Sixth and Fourteenth Amendment Constitutional rights to a fair and impartial trial by the cumulative effect of errors at his state trial.

VI.    Petitioner was deprived of his Sixth Amendment right to the effective assistance of appellate counsel when counsel failed to raise the foregoing grounds on Petitioner's appeal of right after Petitioner specifically requested counsel do so.

9.    Respondent filed an answer to the amended petition on April 16, 2002. Respondent contends that petitioner's first claim is without merit, and that the remaining claims are barred by petitioner's procedural default in the state courts. Petitioner filed a reply to respondent's answer on August 15, 2002.

10.    Meanwhile, on June 7, 2002, petitioner filed a motion for extension of time in which he indicated that he was receiving the assistance of the Innocence Project at Thomas M. Cooley Law School, and that the trial court had ordered additional DNA testing of a semen stain on the victim's clothing.[1] In light of this assertion, and with the concurrence of the parties, on September 26, 2002, I entered an Order staying the case and holding petitioner's habeas application in abeyance pending

---

[1]The DNA testing utilized at trial was done using the Restriction Fragment Length Polymorphism (RFLP) method. Petitioner sought, and the trial court ordered, a test using the Polymerase Chain Reaction (PCR) method. For general discussions of the two methods, see *United States v. Hicks*, 103 F.3d 837, 844-45 (9th Cir. 1996); *United States v. Jackson*, 955 F.2d 786, 792-93 (2d Cir. 1992).

the conclusion of petitioner's state court proceedings.  On July 18, 2004, petitioner filed a motion to lift the stay, indicating that he had received the results of the PCR DNA test and, based on those results, was no longer pursuing any state court remedies.  On November 9, 2004, I entered an Order lifting the stay.

B.      *Factual Background Underlying Petitioner's Conviction*

Petitioner's conviction arises from the March 10, 1990, sexual assault of Lynn Marie Riley. Riley testified that she arrived home on that day at about 1:30 a.m., after having some drinks at various bars with friends.  A few minutes after she arrived home, she felt a hand on her and a man threatened to harm her children if she did not do what he said.  The man removed his clothing and sexually assaulted her.  She did not see the assailant, nor did she recognize his voice.  After the assault, Riley asked the assailant for a cigarette, and he gave her a menthol cigarette.  The man then asked Riley about her money and jewelry.  He then began rummaging through her belongings.  After the assailant left, she waited about five minutes and then went to check on her children.  Noticing that they were sleeping, she then went to sleep for about 20 minutes, thinking that the assailant might still be in the house.

At about 3:00 a.m., Riley awoke and noticed that the screen door to her apartment was shut, but that the glass door was open.  She also noticed that the telephone cord had been severed.  She went to a neighbor's apartment, where she called her cousin.  When she returned from the hospital emergency room the following morning, she noticed that two pieces of artwork had been taken from her apartment.  Riley described her attacker as a white male, based on his voice.  He was not heavy, and she thought he was between 5' 6" and 5' 10" tall.  *See* Trial Tr., Vol. II, at 21-74; Vol. V, at 65.

Detective Cheryl Courtney investigated the assault.  She testified that Riley told her that the

6

assailant was between 25 and 30 years old, and that he had a mustache and a flat tone of voice.  She told Detective Courtney that $80.00 had been taken from her purse, and that two pieces of artwork had been taken from her apartment.  Riley also told Courtney that her apartment was in disarray, and that the phone cord had been severed.  *See id*., Vol. V, at 65-68.  Detective Courtney testified that petitioner was arrested on a "peeping Tom" case on March 15, 1990, at the same apartment complex where Riley lived.  Inside the trunk of petitioner's car was a picture frame similar to one described by Riley as having been taken from her apartment.  A message on the back of the frame had been scratched out, but the word "Lynn" was visible.  When Detective Courtney interviewed him, petitioner claimed that he found the picture frame in a dumpster behind the Next Door Food Store, where he was employed.  Petitioner denied assaulting Riley or taking any of her property.  During the interview, petitioner smoked menthol cigarettes, and Newport brand menthol cigarettes were found in petitioner's apartment.  Three other suspects who were investigated smoked non-menthol cigarettes.  *See id*., Vol. IV, at 3-4, 11-14, 81-83, 85; Vol. V, at 71, 90.  Other witnesses and employees of the food store contradicted petitioner's claim to have found the frame in the dumpster. *See id*., Vol. V, at 57-60, 86-90, 100, 104-06.

Dr. Charlotte J. Word, Ph.D., of CellMark Diagnostics, testified as a DNA expert.  She testified that the DNA of the semen taken from the victim's shirt and that of petitioner's blood sample matched, and that the likelihood of such a match occurring at random was 1 out of 3.9 million people.  *See id*., Vol. III, at 60.

The prosecution also presented several pieces of non-DNA forensic evidence.  Forensic expert David Stephens testified that three hairs found at the scene were similar in all characteristics to defendant's hair.  He eliminated other possible sources for that hair.  Stephens  also testified that

7

a serological analysis of a semen stain on the victim's shirt was consistent with petitioner's blood type. *See id.*, Vol. V, at 10-12, 20-23, 27, 95. Serology expert Robert Avery testified that defendant was an "A secretor," while the victim and two other suspects were "O secreters."[2] Three cigarette butts found at the crime scene were Newport brand menthol cigarettes, and contained saliva from an A secretor. *See id.*, Vol. V, at 38, 48-53, 83-85.

Petitioner presented an alibi defense. Judy Hebl, a bartender at Jasper's Bar, testified that petitioner was in the bar on the night of the assault with Cathy Guzman. She testified that they left the bar between 2:00 and 2:30 a.m. *See id.*, Vol. VI, at 3-4. Guzman, petitioner's girlfriend, likewise testified that they two met at a 7-Eleven store in Bay City, where they spoke with Joyce Iagaz. They arrived at Jasper's at about 11:30 p.m., and she returned home the following morning at about 4:00 a.m. Petitioner was with her during this entire time span. *See id.*, Vol. VI, at 13-15. Petitioner testified likewise, *see id.*, Vol. VI, at 21-23, although this testimony contradicted the earlier version of his whereabouts he had given Detective Courtney. *See id.*, Vol. V, at 81.

C.     *Procedural Default*

Respondent argues that petitioner's second through sixth habeas claims are barred by his procedural default because petitioner failed to raise these claims on his direct appeal. Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722,

---

[2]"Being a secretor means that an individual has blood antigens in their other bodily fluids, such as saliva or semen, that allow an ABO blood type to be determined from these other fluids." *Washington v. Murray*, 4 F.3d 1285, 1286 n.2 (4th Cir. 1993); *see also, Jennings v. Woodford*, 290 F.3d 1006, 1008 n.2 (9th Cir. 2002).

729 (1991).  However, "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar." *Harris*, 489 U.S. at 263. Furthermore, "only a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review . . . of a federal constitutional claim." *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348-51 (1984)); *see also*, *Calderon v. United States Dist. Ct. for the E. Dist. of Cal.*, 96 F.3d 1126, 1129 (9th Cir. 1996) (internal quotation omitted) ("For the procedural default doctrine to apply, a state rule must be clear, consistently applied, and well-established at the time of the petitioner's purported default.").

Respondent has failed to show that these claims are procedurally defaulted.  As noted above, the trial court explicitly found that petitioner had established good cause for failing to raise these claims on appeal, but that the claims were meritless.  Thus the trial court expressly relied on the merits, rather than on any procedural bar.  The Michigan Court of Appeals and the Michigan Supreme Court both rejected petitioner's appeal based on his "failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)."  Looking at the structure of Rule 6.508(D), it would appear that this language indicates that petitioner failed to meet the substantive burden of entitlement to relief, rather than failed to comply with one of the procedural aspects of the rule. This, in turn, would not constitute an invocation of a state procedural default barring habeas review of petitioner's claims.  Respondent, however, relies on the Sixth Circuit's decision in *Simpson v. Jones*, 238 F.3d 399 (6th Cir. 2000), in which the court held otherwise and concluded that this identical language constitutes an invocation of the procedural aspects of Rule 6.508(D), and thus bars federal habeas review.  *See Simpson v. Jones*, 238 F.3d 399, 408 (6th Cir. 2000).

Were *Simpson* the last word on the matter, this Court would of course be bound to follow the Sixth Circuit's holding. However, a more recent decision by the Sixth Circuit has limited the breadth of the *Simpson* rule, rendering it inapplicable here. In *Abela v. Martin*, 380 F.3d 915 (6th Cir. 2004), the Court explained that its previous decisions in *Simpson* and *Burroughs v. Makowski*, 282 F.3d 410 (6th Cir. 2003), were based on the fact that the lower state courts in those cases had expressly invoked the procedural aspect of Rule 6.508(D)(3), and therefore the court could be fairly certain that the Michigan Supreme Court's citation to "MCR 6.508(D)" was intended as an invocation of the procedural aspect of that rule. In *Abela*, however, the lower courts had addressed the petitioner's claims on the merits, and this was enough to distinguish *Simpson* and *Burroughs*, as the court explained:

> In short, unlike in *Simpson* and *Burroughs*, the state courts below the supreme court never invoked a procedural bar here, but rather repeatedly ruled on the merits. The procedural circumstances in this case are, therefore, materially different from those in *Simpson* and *Burroughs*, where the lower state courts actually invoked a procedural bar, making it clearer that the Michigan Supreme Court was also invoking such a bar when it referred to M.C.R. 6.508(D). But given that all of the lower state courts adjudicated Abela's case on the merits, it is not at all clear that the Michigan Supreme Court's summary order relies on a procedural bar, as opposed to the non-procedural reason that Abela simply failed to meet his burden of "establishing entitlement to the relief requested." Indeed, given the line of prior merits determinations in Abela's case, it is just as reasonable to presume that the Michigan Supreme Court's reference to M.C.R. 6.508(D) signaled its agreement with the lower courts' merits determinations as it is to presume that the reference signaled, for the first time in this case, the invocation of a procedural bar.
>
> In short, the procedural facts of *Simpson* and *Burroughs* are distinguishable from our case. The facts in *Simpson* and *Burroughs* inspired greater certainty that the Michigan Supreme Court actually relied on a procedural bar in rendering its judgment. No such clarifying indicators are present here. Moreover, *Simpson* and *Burroughs* do not purport to eviscerate our Circuit's rule that a state procedural rule is an "independent and adequate" state ground only if the state court rendering judgment in the case "clearly and expressly stated that its judgment rested on a procedural bar." *Sparkman*, 94 F.3d at 202. *Simpson* and *Burroughs* did not hold that we should divine procedural default from any and all references to M.C.R. 6.508(D) where such default may actually have occurred, but where the procedural history

raises genuine questions as to the state court's actual reliance on a procedural bar. To suggest that those cases did so hold is to accept that they invert the inquiry into whether federal review of the habeas claims is permitted. That is, pursuant to *Maupin v. Smith*, 785 F.2d 135 (1986), whether the petitioner actually failed to comply with a procedural rule is only the predicate, not the ultimate, question before us. The ultimate legal questions are whether the court relied on and expressly invoked that procedural bar and whether it is an "independent and adequate" ground for precluding review. *See Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir.2001). If a state court is slurring its words, our job is not to guess what it might be saying, but rather to demand that it enunciate more clearly. Here, because of numerous factors--the Michigan Supreme Court's reference only to M.C.R. 6.508(D), the absence of a clear and express invocation of a procedural bar, and the plausibility, based on the prior state courts' merits rulings, that the Michigan Supreme Court, too, grounded its decision in a non-procedural reason based on Abela's failure to "establish[] entitlement to relief"–we cannot find that M.C.R. 6.503(D)(3), the state procedural rule urged by Respondent, was actually relied on by the Michigan Supreme Court in this case. For the same reasons, we cannot find that M.C.R. 6.503(D) constitutes an adequate and independent basis for the state supreme court's decision here.

*Abela*, 380 F.3d at 923-24; *see also*, *Williams v. Jones*, 231 F. Supp. 2d 586, 597 (E.D. Mich. 2002)

(Lawson, J.).

Here, as in *Abela*, the trial court did not reject petitioner's claims on the basis of his failure to raise those claims on direct appeal, *i.e.*, under the procedural rule set forth in Rule 6.508(D)(3). Rather, the trial court found that petitioner had established good cause, but that the claims were without merit. Thus, in the legally relevant respects this case is identical to *Abela*, and under that decision petitioner's claims are not defaulted. Accordingly, the Court should conclude that petitioner's claims are not barred by a procedural default.

Further, even assuming, *arguendo*, that petitioner's claims are defaulted, it is nevertheless necessary to consider the merits of his claims. As noted above, petitioner can still have his defaulted claims reviewed on the merits if he can show cause for, and prejudice attributable to, his default in the state courts. Petitioner contends that his appellate counsel was ineffective for failing to raise these claims on direct appeal. If petitioner's position is correct, counsel's ineffectiveness may

11

constitute cause to excuse any procedural default.  *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  To demonstrate that appellate counsel was ineffective petitioner must show, *inter alia*, that his claims would have succeeded on appeal.  *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996).  Given that the cause and prejudice inquiry merges with an analysis of the merits of petitioner's defaulted claims, it is better to simply consider the merits of these claims, which I do below.  *See Jamison v. Collins*, 100 F. Supp. 2d 647, 676 (S.D. Ohio 2000); *Watkins v. Miller*, 92 F. Supp. 2d 824, 832 (S.D. Ind. 2000); *cf. Strickler v. Greene*, 527 U.S. 263, 282 (1999) (considering merits of petitioner's habeas claims where inquiry into the merits mirrored cause and prejudice inquiry).

D.      *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).  Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its

13

decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

E.     *DNA Evidence (Claim I)*

       1.     *Clearly Established Law*

       Unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude. *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987). "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable

14

in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994); *see also, Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (federal habeas courts have no authority to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness in the trial process).

In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983). This general rule regarding the limited cognizability of evidentiary claims on federal habeas review applies equally to claims based on the allegedly improper admission of scientific evidence. *See, e.g.*, *Norris v. Schotten*, 146 F.3d 314, 335 (6th Cir. 1998); *Spencer v. Murray*, 18 F.3d 237, 239 (4th Cir. 1994); *Arnold v. Wyrick*, 646 F.2d 1225, 1228 (8th Cir. 1981); *Albanese v. McGinnis*, 823 F. Supp. 521, 553 (N.D. Ill. 1993).

2.    *The Davis/Frye Standard*

Before addressing the factual and legal issues surrounding petitioner's claim, it is appropriate to describe the standard pursuant to which the Michigan courts evaluate scientific evidence of the type at issue here. At the time of petitioner's conviction, the Michigan courts applied the oft-used,

15

and oft-criticized, framework established in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).[3]

In *Frye*, the court established what came to be known as the "general acceptance" test for determining whether new or novel scientific techniques may be admitted into evidence. The court explained:

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be *sufficiently established to have gained general acceptance in the particular field in which it belongs*.

*Frye*, 293 F. at 1014 (emphasis added). Although not explicitly "adopting" the *Frye* standard, the Michigan Supreme Court employed a similar analysis in *People v. Davis*, 343 Mich. 348, 370-72, 72 N.W.2d 269, 281-82 (1955), and the Michigan courts have interpreted *Davis* as adopting the *Frye* rule. *See People v. Young*, 418 Mich. 1, 17-20, 340 N.W.2d 805, 812-13 (1983); *People v. Haywood*, 209 Mich. App. 217, 221, 530 N.W.2d 497, 499-500 (1995). Under the *Davis/Frye* rule, as it is known, novel scientific evidence is inadmissible unless the proponent of the evidence

---

[3]The test from *Frye* was the standard governing the admissibility of scientific evidence in the federal courts until it was abrogated by the adoption of Rule 702 of the Federal Rules of Evidence, as interpreted by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). For an excellent discussion of the criticisms of the *Frye* test and the eventual abrogation of the *Frye* rule in the federal courts, see Major Victor Hansen, *Rule of Evidence 702: The Supreme Court Provides a Framework for Reliability Determinations*, 162 MIL. L. REV. 1, 3-18 (1999).

Effective January 1, 2004, Michigan amended Rule 702 to mirror the federal rule. As the Supreme Court has explained, this amendment to Rule 702 explicitly incorporates the reliability standards identified by the United States Supreme Court in *Daubert*. *See Gilbert v. DamilerChrysler Corp.*, 470 Mich. 749, 781, 685 N.W.2d 391, 408 (2004). At the time of petitioner's trial and appeal, however, the *Davis/Frye* test was the means by which the admissibility of scientific evidence was determined in Michigan. *See Coy II*, 258 Mich. App. at 10 n.3, 669 N.W.2d at 838 n.3; *People v. McMillan*, 213 Mich. App. 134, 137 n.2, 539 N.W.2d 553, 555 n.2 (1995).

demonstrates that it has been generally accepted in the relevant scientific community. *See Haywood*, 209 Mich. App. at 221, 530 N.W.2d at 500.

3.   *The DNA Evidence and State Court Proceedings*

Petitioner challenges the admission of the DNA statistical evidence at trial.  As noted above, Dr. Word testified that petitioner's known DNA sample matched the DNA extracted from the semen on the victim's shirt, and that the likelihood of a random match occurring was one in 3.9 million people. *See* Trial Tr., Vol. III, at 60.  Counsel attacked Dr. Word's testimony on cross-examination, and elicited from her that the random match likelihood was simply a statistical evaluation, because there was no database of the DNA characteristics of every human being. *See id*. at 92.[4]

---

[4]A brief description of the DNA identification process and the product rule are appropriate here.  The DNA molecule "contains the coded information that provides the genetic blueprint for all living things.  Every cell of a particular individual contains the same configuration of DNA." *United States v. Jakobetz*, 955 F.2d 786, 791 (2d Cir. 1992).  DNA analysis is an important forensic tool because, "with the exception of identical twins, no two individuals have the same DNA configuration." *Id*.  A molecule of DNA is shaped like a double helix, and resembles a twisted ladder.  Each "rung" of the ladder is made up of molecules called "bases," composed of a pair of organic bases.  The four organic basis are adenine, guanine, cytosine, and thymine, and due to their chemical compositions adenine will attach only to thymine and guanine will attach only to cytosine.  Each rung is called a "base pair" or "base sequence."  Although about 99% of the DNA molecules in people are the same, certain sections of the molecule, called polymorphisms may take different forms in different individuals.  A sequence of based pairs which produces a particular protein is called a gene, and polymorphic genes have two or more versions, called alleles. *See id*.

In petitioner's case, the DNA identification was conducted using the method known as Restriction Fragment Length Polymorphism (RFLP), which examines a fragment of polymorphism the length of which is determined by the number of repeat sequences of based pairs, called Variable Number Tandem Repeats (VNTRs). *See United States v. Bonds*, 12 F.3d 540, 550 (6th Cir. 1993); *Jakobetz*, 955 F.2d at 791.  The RFLP process ultimately yields an audiograph–essentially an x-ray–producing bands which indicate the location of a polymorphic segment.  The location of the segment in turn indicates the length fo the VTNR segment. *See Jakobetz*, 955 F.2d at 792-93.  "Because individuals vary in the length of the DNA fragments that contain the polymorphic DNA segments, individuals tend to differ in the position of their bands on a DNA print." *Id*.  This process is repeated for multiple alleles, or loci.

After the RFLP procedure is completed and a match is found, the lab makes a

Following trial, Cellmark performed anew its statistical analysis using the newly developed standards of the National Research Counsel, established in 1992. Using those standards, Cellmark indicated that the likelihood of a random match was one in 229,000 people. On February 18, 1992, prior to the release of the NRC standards and prior to receiving Cellmark's new analysis, petitioner filed a motion for a new trial, arguing that the statistical evidence was unreliable because there was no independent validation studies regarding the frequency of genetic markers within the population. *See* Mot. Hr'g Tr., dated 2/18/92, at 5-9. The trial court initially ordered a *Davis/Frye* hearing on the matter, but latter reversed itself. Petitioner advised the trial court of the new NRC standards, and argued that the standards were so new that there could not have been general acceptance of Cellmark's techniques, and that there had been no peer review publications with respect to the type of statistical evidence offered at petitioner's trial. The trial court ultimately denied petitioner's motion for a new trial without conducting a *Davis/Frye* hearing.

On appeal, the Michigan Court of Appeals rejected petitioner's claim, concluding that the trial court did not abuse its discretion either in permitting Word's testimony or in denying petitioner's motion for a new trial. *See* Ct. App. op., at 1. In reaching this conclusion, the court relied on its prior decision in *People v. Chandler*, 211 Mich. App. 604, 536 N.W.2d 799 (1995),

---

statistical estimate of the rarity of the pattern of DNA bands found in the suspect's sample. By conducting DNA studies on FBI agents, the FBI has developed a table of DNA allele frequencies for each of three racial groups–caucasian, black and hispanic–using a "fixed-bin" method, in which the lab divides up the size of the alleles into bins. . . . The forensic scientist uses these tables to determine the frequency of each allele in the particular suspect's sample. To estimate the frequency of a suspect's overall DNA pattern, the individual allele frequencies are multiplied together, using a multiplication or product rule, to compute an aggregate estimate of the probability that this combination of alleles would be encountered in a particular racial population.

*Bonds*, 12 F.3d at 550; *see also*, *Jakobetz*, 955 F.2d at 793.

which in turn reaffirmed the court of appeals's decision in *People v. Adams*, 195 Mich. App. 267, 489 N.W.2d 192 (1992).  In *Adams*, the court of appeals concluded that the "product" or "multiplication" method of computing likelihood ratios used by Cellmark was sufficiently accepted to be admissible.  *See Adams*, 195 Mich. App. at 278-80, 489 N.W.2d at 197-98.  In *Chandler*, the court reaffirmed its decision in *Adams* notwithstanding the NRC publication, rejecting a claim similar to the one made by petitioner:

> Just as *Adams* was decided, a debate erupted in the scientific community concerning DNA statistical evidence. A leading scientific journal, *Science,* published two articles demonstrating an apparent disagreement among population geneticists about the phenomenon known as substructuring or subgrouping in populations. See Lewontin & Hartl, *Population Genetics in Forensic DNA Typing,* and Chakraborty & Kidd, *The Utility of DNA Typing in Forensic Work,* Science (December 20, 1991). Shortly thereafter, the National Research Council (NRC) released a report acknowledging the controversy concerning statistical analysis. Instead of resolving the dispute, the NRC report assumed that substructuring existed and suggested a modified conservative "ceiling" approach that gives the benefit of doubt to defendants until the controversy is resolved.  *People v. Amundson,* 34 Cal.App.4th 1151, 41 Cal.Rptr.2d 127 (1995); *Taylor v. State*, 889 P.2d 319, 335-336 (Okla.Crim.App.1995).
>
> Defendant contends that because neither Cellmark nor the FBI used the conservative ceiling approach in its statistical analyses, the trial court erred in admitting the results into evidence. Defendant relies on several cases in other jurisdictions that adopted the NRC report. See, e.g., *People v. Barney, supra; Commonwealth v. Lanigan,* 413 Mass. 154, 596 N.E.2d 311 (1992); see also *People v. Wallace,* 14 Cal.App.4th 651, 17 Cal.Rptr.2d 721 (1993). Defendant also contends that because the statistical analysis evidence is necessary to understand the DNA matching results, the matching results must also be excluded from evidence. *Barney, supra; Taylor, supra* at 337, n. 81.
>
> Most recently, Eric S. Lander and Bruce Budowle definitively resolved the controversy over DNA statistical evidence. Lander & Budowle, *DNA Fingerprinting Dispute Laid to Rest,* Nature (October 27, 1994); *Amundson, supra; Taylor, supra; Lindsey v. People,* 892 P.2d 281 (Colo.1995). The recent article indicates that the product rule method of DNA statistical evidence is now generally accepted in the relevant scientific community. Accordingly, we reject defendant's arguments and reaffirm our decision in *Adams.* Courts of this state may continue to take judicial notice of the admissibility of the RFLP method of DNA testing, including the statistical analysis.

*Chandler*, 211 Mich. App. at 609-11, 536 N.W.2d at 802-03 (footnote omitted).

    4.    *Analysis*

In his second amended habeas application, petitioner contends that the admission of the statistical analysis was improper because it was not generally accepted in the scientific community at the time of his trial, as required by the *Davis/Frye* rule, and that he was denied due process of law when the trial court failed to hold a *Davis/Frye* hearing. These arguments, however, present issues of state law not cognizable on habeas review. As noted above, the question is not whether the admission of this evidence was improper under the *Davis/Frye* rule, or whether the evidence was inadmissible on some other state law basis. *See Milone v. Camp*, 22 F.3d 693, 702 (7th Cir. 1994). Rather, the only issue for this Court on habeas review is whether the admission of the evidence denied defendant a fair trial; that is, whether the evidence was "almost totally unreliable" such that "the factfinder and the adversary system w[ould] not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983). Importantly, the question here focuses on *evidentiary* reliability, not *scientific* reliability. And, evidentiary reliability depends upon scientific validity, not scientific reliability. *See Daubert*, 509 U.S. at 579 n.9. The Court should conclude that petitioner has failed to meet this burden.

It is true that there is a wide discrepancy between Word's testimony at petitioner's trial regarding the likelihood of a random match (1 in 3.9 million) and Cellmark's subsequent recalculation of the likelihood of a random match (1 in 229,000). However it is the latter figure, rather than the former, which suffers from questions of scientific validity. As petitioner himself indicates, the recalculated random match figure was based on the 1992 NRC report, which questioned the reliability of the product method because of its failure to account for population

20

substructures.  The NRC therefore proposed a "ceiling"method, which resulted in the revised calculation in petitioner's case.  As the courts have subsequently explained, however, the NRC ceiling method "was merely a temporary conservative measure adopted to allow for the continued admission of DNA evidence derived through use of the product rule until the debate about population substructures could be resolved."  *United States v. Lowe*, 954 F. Supp. 401, 407-08 (D. Mass. 1996); *see also*, *United States v. Chischilly*, 30 F.3d 1144, 1158 n.28 (9th Cir. 1994) ("Under the ceiling principle, as advocated by the NRC Report, in the statistical calculation phase each allele will be assigned a value equal to the greater of five percent or the highest frequency resulting from tests of the relevant population.").  Importantly, this "interim principle was roundly criticized as arbitrary and unscientific."  *Lowe*, 954 F. Supp. at 408; *see also*, *Chischilly*, 30 F.3d at 1158 n.28 ("This procedure places what some scientists and statisticians regard as a rather conservative, arbitrary limit on the odds against a member of a given population having the same array of alleles at each locus tested.").

A subsequent 1996 NRC report "recommends use of the product rule when the race of the suspect is known."  *United States v. Mason*, 58 M.J. 521, 524 n.11 (Army Ct. Crim. App. 2003); *see also*, *State v. Bailey*, 677 N.W.2d 380, 396 (Minn. 2004).  Following this report, "[r]esults after application of the product rule have been widely admitted in federal criminal trials involving DNA evidence," *Mason*, 58 M.J. at 524 n.11; *see also*, *Chischilly*, 30 F.3d at 1157-58, and the state courts have uniformly concluded that the product rule is either reliable under a *Daubert* analysis or is generally accepted under a *Frye* analysis.  *See People v. Soto*, 88 Cal. Rptr. 2d 34, 54-55 (Cal. Ct. App. 1999) (citing cases); *State v. Kinder*, 942 S.W.2d 313, 327 (Mo. 1996) (citing cases).

Thus, although there was some confusion immediately following petitioner's trial–which

confusion resulted in the more conservative Cellmark calculation–subsequent developments have confirmed that the product rule upon which Word's testimony at petitioner's trial was based is both reliable and generally accepted in the scientific community.  Any question as to the *scientific* reliability of the results, as opposed to their *evidentiary* reliability (i.e., scientific validity), went to the weight rather than the admissibility of Word's testimony.  In light of these developments, petitioner cannot show that the admission of Word's testimony deprived him of a fair trial. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.      *Ineffective Assistance of Counsel (Claims II & VI)*

Petitioner next contends that his trial and appellate counsel were ineffective in a number of respects.  Specifically, petitioner contends that trial counsel was ineffective for failing to: (1) seek complete discovery; (2) object to prosecutorial misconduct; (3) investigate and present an alibi witness; and (4) object to a tainted jury venire.  He also contends that appellate counsel was ineffective for failing to raise his second through fifth habeas claims on direct appeal.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense.  *Id*. at 687.  These two components are mixed  questions of law and fact.  *Id*. at 698.  Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the

22

defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id.* at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

2. *Analysis*

*a. Failure to Seek Complete Discovery*

Petitioner first contends that his trial counsel was ineffective for failing to seek complete discovery regarding the testing of the DNA samples by Cellmark. Petitioner contends that counsel should have sought discovery concerning the methodology, processes, and statistical databases used by Cellmark, the laboratory error rates, and the qualifications of all persons involved in testing the samples. Petitioner contends that, had counsel requested this information, he would have discovered that Cellmark previously made mistakes in performing DNA testing, which could have given the jury a reasonable doubt about his guilt. The trial court rejected this claim on the merits, explaining:

23

The record reveals that defense counsel requested and received the information needed for the Defendant's expert, Kenneth R. Stone, Ph.D., to evaluate Cellmark's position. Further, a letter appearing in the record from Defendant's expert dated September 30, 1991, state[d] that the materials received were "quite adequate." In fact, Dr. Stone wrote:

> I see no reason to challenge this data which is well documented and derived from high quality audiographs. It would appear that all DNA bands obtained form the questionable stain on the T-shirt can be accounted for by comparison with the blood specimens of the victim and Mr. Murphy. Therefore, the chances of a third individual being involved are remote.

Letter from Kenneth R. Stone, Ph.D to Mr. George E. Thick II, dated September 10, 1991. Thus, trial counsel did perform discovery with respect to the DNA evidence and did receive an expert opinion regarding the People's DNA evidence against Defendant. Consequently, the Court finds that the Defendant has failed to show that trial counsel's performance was deficient or that he was prejudiced by the alleged deficient performance.

Trial Ct. op., at 4-5.

Petitioner has not shown that this determination was unreasonable. Petitioner's main argument is that Dr. Stone was not qualified to give an opinion on the DNA evidence, and that he could not have done so because he was paid only $250.00 for what another expert contends should have been at least ten hours of work. As to the qualifications issue, Dr. Stone's letter to petitioner's counsel indicates that he was the Director of both paternity testing and molecular immunopathology at Sparrow Hospital. His conclusory assertions notwithstanding, petitioner has offered nothing to show that Dr. Stone was not, in fact, qualified, or that either counsel or the Court could not reasonably conclude that he was qualified. Thus, petitioner has failed to show that counsel's performance was deficient. *See Easley v. Clarke*, 38 Fed. Appx. 365, 366 (9th Cir. 2002); *cf. Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998) (counsel is entitled to rely on expert in formulating trial strategy).

Nor has petitioner shown that he was prejudiced. He contends that further discovery would

24

have revealed that Cellmark had made mistakes with other DNA samples in other cases. However, he has not alleged (much less shown), that any errors infected the testing of his DNA samples. Thus, he cannot show that counsel was deficient by failing to seek this discovery, or that he was prejudiced by counsel's omission.

### b. Failure to Object to Prosecutorial Misconduct

Petitioner next contends that counsel was ineffective for failing to object to various instances of prosecutorial misconduct. As explained below, *see infra* part G, each of these claims of prosecutorial misconduct is without merit. Because any objection would have been meritless, counsel was not ineffective. *See Anderson v. Goeke*, 44 F.3d 675, 680 (8th Cir. 1995) (counsel not ineffective for failing to raise meritless objection); *Burnett v. Collins*, 982 F.2d 922, 929 (5th Cir. 1993) (same).

### c. Failure to Investigate/Present Alibi Witness

Petitioner next contends that counsel was ineffective for failing to investigate and call Joyce Iagaz as a witness. Iagaz was the person whom petitioner and his alibi witness testified they met at a Bay City 7-Eleven prior to going to Jasper's Bar. The trial court denied this claim, reasoning that the decision of what witnesses to call is a strategic decision committed to counsel's discretion, and that petitioner failed to show that Iagaz's testimony would have been anything other than cumulative. *See* Trial Ct. op., at 6. The Court should conclude that this determination was reasonable.

It is true that failure to call a known, disinterested alibi witness generally constitutes deficient performance. *See Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004); *Blackburn v. Foltz*, 828 F.2d 1127, 1183 (6th Cir. 1987). However, even assuming that counsel was deficient in failing to

interview Iagaz and present her as a witness, to succeed on this claim petitioner is also required "to show that but for counsel's failure to adequately investigate, prepare, and present [Iagaz], there was a reasonable probability that the outcome of petitioner's trial would have been different." *Monroe v. Smith*, 197 F. Supp. 2d 753, 761 (E.D. Mich. 2001) (Tarnow, J.).  Petitioner cannot make this showing.

Petitioner and his girlfriend both testified that they met Iagaz prior to going to Jasper's Bar, and that they arrived at Jasper's at about 11:30 p.m.  However, petitioner does not dispute, nor did any witness at trial dispute, that the crime occurred at around 1:30 a.m.  Counsel did present the testimony of a disinterested alibi witness–Judy Hebl, the bartender at Jasper's–who provided petitioner an alibi covering the time of the sexual assault.  Iagaz, however, could not have done so. By petitioner's and his girlfriend's accounts, they left Iagaz several hours before the crime occurred. Even assuming that Iagaz would have been available and willing to testify exactly as petitioner contends she would have, petitioner was not prejudiced because she could not account for petitioner's whereabouts during the time the crime was committed.  *See Fargo v. Phillips*, 58 Fed. Appx. 603, 607-08 (6th Cir. 2003); *White v. Kapture*, No. 00-73974-DT, 2001 WL 902500, at *8 (E.D. Mich. June 26, 2001) (O'Meara, J.); *Thomas v. Newland*, No. C-96-0547, 1999 WL 66520, at *3-*4 (N.D. Cal. Feb. 2, 1999); *United States ex rel. Emerson v. Gramley*, 902 F. Supp. 143, 147 (N.D. Ill. 1995).  This is particularly so in light of the fact that petitioner did present a disinterested alibi witness who accounted for his whereabouts at the time of the crime, but the jury rejected her testimony.  In these circumstances, the trial court's conclusion that petitioner was not prejudiced by counsel's failure to interview and call Iagaz was reasonable.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### d.  Failure to Object to Jury Taint

Petitioner also contends that his counsel was ineffective for failing to request a curative instruction after juror Krantz tainted the jury pool by stating during *voir dire* that DNA testing is infallible, and by failing to request further questioning of the venire to see if Juror Krantz's statements had any effect on the jury.  During *voir dire*, the following exchange took placed between Juror Krantz and the prosecutor:

| | |
|---|---|
| MS. BOES: | Would you have any problem considering DNA identification? |
| JUROR KRANTZ: | Can I ask a question? |
| MS. BOES: | Sure. |
| JUROR KRANTZ: | Does that have anything to do with like paternity? |
| MR. THICK: | I'm sorry, I can't hear you. |
| JUROR KRANTZ: | Does that have anything to do with similarities to paternity? |
| MS. BOES: | It is used in paternity testing, a type of DNA. |
| JUROR KRANTZ: | I believe in it.  I just went through it so – |
| MS. BOES: | You have some idea about that type of testing, is that what you are saying? |
| JUROR KRANTZ: | Uh-huh. |
| MS. BOES: | The fact that you already know something about it, does that make a difference to you? |
| JUROR KRANTZ: | I believe if the proof is there and, you know, and it comes out, that proof, because mine come out the highest it can come out.  The proof was there. |
| MS. BOES: | So you are saying you would want to hear what the proof is? |
| JUROR KRANTZ: | Uh-huh. |
| MS. BOES: | Do you understand the concept of reasonable doubt? |
| JUROR KRANTZ: | Uh-huh. |
| MS. BOES: | And do you have any problem with that standard, you think it should be higher? |
| JUROR KRANTZ: | That's – I think that's the doubt that I'm feeling as far as the DNA.  That's the problem I'm feeling. |
| MR. THICK: | I'm sorry, ma'am.  I can't hear you. |
| JUROR KRANTZ: | That's the problem I'm feeling is the part with the DNA, the scientific, because I've gone through the testing. |
| MS. BOES: | Since you've been involved in a process that involved DNA identification testing, you somehow think that you would have a problem with the case then? |
| JUROR KRANTZ: | As far as if the testing come back to a guilt or, you know, |

| | |
|---|---|
| | they have already proved him or – |
| MS. BOES: | Okay, But you are saying that you want to hear what the evidence is or how it was done or maybe how it's different from what you've experienced?  Because it's not exactly the same, necessarily. |
| JUROR KRANTZ: | That's why I was wondering if that's what it is. It's – |
| MS. BOES: | It's the same type, I believe, but you will hear evidence about what the DNA testing was here, what the process was, what the procedures are.  And so you will be able to make up your own mind about that.  You think you can do that then? |
| JUROR KRANTZ: | Uh-huh. |

Trial Tr., Vol. I, at 169-72.  Upon defense counsel's motion, Juror Krantz was excused for cause. *See id.* at 173.

Although phrased solely as an ineffective assistance claim in his amended habeas application, in his reply brief petitioner contends both that counsel was ineffective for failing to request a curative instruction or further questioning of the jurors, and that he was denied a fair trial because Juror Krantz's statements tainted the jury pool.  Whether viewed as an ineffective assistance claim or a substantive jury claim, however, petitioner is not entitled to habeas relief.

With respect to the substantive jury claim, to succeed on this basis "petitioner 'must demonstrate either that the trial resulted in actual prejudice or that it gave rise to a presumption of prejudice because it involved "such a probability that prejudice will result that it is deemed inherently lacking in due process."'" *Lucero v. Kirby*, 133 F.3d 1299, 1308 (10th Cir. 1998) (quoting *Brecheen v. Reynolds*, 41 F.3d 1343, 1350 (10th Cir. 1994) (quoting *Estes v. Texas*, 381 U.S. 532, 542-43 (1965))); *cf. Gall v. Parker*, 231 F.3d 265, 308 (6th Cir. 2000)).  Here, "petitioner has not identified any actual prejudice on the part of any juror."  *Lucero*, 133 F.3d at 1308.  He does not identify any comments from the *voir dire*, or point to any other evidence in the record, that the jurors who ultimately sat on his jury were actually biased.  Further, petitioner has alleged nothing to

28

establish a presumption of bias. Juror Krantz's comments did not, as petitioner suggests, state that DNA testing was infallible. She merely indicated that she would give great weight to such evidence in light of her experience with DNA testing. The prosecutor repeatedly noted, however, that the standard of proof was proof beyond a reasonable doubt, and that the jury would be given the information necessary during the case to evaluate the credibility of the evidence. In these circumstances, "[t]he spectre of bias or prejudice must become considerably more tangible before it can overcome the general presumption in favor of jury impartiality." *United States v. Delval*, 600 F.2d 1098, 1102 (5th Cir. 1979) (no presumption of prejudice arose from presence in venire panel of a former DEA informant); *see also*, *United States v. Cantwell*, 41 Fed. Appx. 263, 269 (10th Cir. 2002) (no presumption of prejudice arose from comments of three jurors indicating that they were familiar with defendant's pyramid scheme; jurors' comments were brief and quickly terminated by the court and there was no evidence of actual bias on the part of the remaining jurors); *United States v. Shropshire*, 498 F.2d 137, 139 (6th Cir. 1974).

Nor can petitioner show that counsel was ineffective for failing to request a curative instruction or have the jury questioned about Krantz's statements. A defense counsel's actions during *voir dire* are presumed to be matters of trial strategy and cannot serve as the basis of an ineffective assistance of counsel claim unless "counsel's decision is shown to be so ill-chosen that it permeates the entire trial with unfairness." *Miller v. Francis*, 269 F.3d 609, 615-16 (6th Cir. 2001). Petitioner has failed to show that counsel's failure to request an explicit curative instruction or further question the jury venire was an unreasonable tactical decision. On the contrary, by doing so counsel would have highlighted Juror Krantz's statements to the other members of the venire. *See Wilson v. Henry,* 185 F. 3d 986, 991 (9th Cir. 1999) (counsel's failure to focus on his client's

criminal history and to discover potential juror prejudice and whether the jurors could follow limiting instructions on the petitioner's criminal history was not ineffective assistance of counsel; all jurors stated they would be fair and follow the law as instructed, and counsel's choice to rely on such a commitment, without emphasizing petitioner's criminal history, merited deference as a tactical decision).  Further, to establish the prejudice component of his ineffective assistance of counsel claim petitioner must show that a juror seated in his case was actually biased against him. petitioner must show that the juror was actually biased against him. *See Miller*, 269 F.3d at 616; *Hughes v. United States,* 258 F. 3d 453, 458 (6th Cir. 2001).  As noted above, petitioner has failed to make this showing.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### e.  Appellate Counsel

Finally, petitioner contends that his appellate counsel was ineffective for failing to raise his second through fifth habeas claims on direct appeal.  The Court should conclude that petitioner is not entitled to habeas relief on this claim because he cannot establish prejudice from counsel's failure to raise these claims on direct appeal.  In the appellate counsel context, a showing of prejudice requires a showing that petitioner's claims would have succeeded on appeal.  *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996).  As explained in this Report, all of petitioner's claims are without merit, and thus petitioner cannot show that counsel was ineffective for failing to raise them on direct appeal.

G.    *Prosecutorial Misconduct (Claim III)*

Petitioner next contends that he was denied a fair trial by several instances of prosecutorial misconduct.  The Court should conclude that petitioner is not entitled to habeas relief on these

claims.

1.     *Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id*. (internal quotation omitted). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted). In sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id*. (internal quotation omitted).

2.     *Analysis*

a. *Vouching for DNA Evidence*

Petitioner first argues that he was denied a fair trial when the prosecutor vouched for the reliability of the DNA evidence. During closing argument, the prosecutor summarized for the jury the DNA evidence presented by Dr. Word, and reasoned that Word's testimony "was uncontradicted, ladies and gentlemen. With even the most conservative estimate, Dr. Word explained to you only one in 3.9 million persons, only one might possibly match that evidence." Trial Tr., Vol. VI, at 45.

31

During rebuttal, the prosecutor stated that "Dr. Word gave you her opinion as a scientist – her opinion as a scientist who believes that her integrity is important and that she's capable of maintaining it." *Id*. at 59. Petitioner contends that these statements constitute improper vouching for the credibility of both the DNA evidence and Dr. Word. The Court should disagree.

It is well established that it is improper for a prosecutor to personally vouch for the credibility of her witnesses. Improper vouching occurs either (1) "when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the [prosecutor's office] behind that witness," or (2) through "comments that imply that the prosecutor has special knowledge of facts not in front of the jury." *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999); *see also*, *United States v. Emuegbunam*, 268 F.3d 377, 404 (6th Cir. 2001).[5] The prosecutor's comments here did neither. The prosecutor accurately described the testimony presented by Word, and did not rely on facts not in evidence to bolster the DNA evidence. Likewise, the prosecutor merely noted that Word was a scientist who valued her integrity; she did not state her own belief in Word's testimony. In short, the prosecutor's comments were permissible characterizations of the evidence. As such, they did not constitute impermissible vouching for the credibility of the witnesses or the guilt of petitioner. *See, e.g.*, *Nichols v. Scott*, 69 F.3d 1255, 1283 (5th Cir. 1995) (comment "is permissible to the extent that it draws a conclusion based solely on the evidence presented.") (internal quotation omitted); *Martin v. Foltz*, 773 F.2d 711, 717 (6th Cir. 1985) (prosecutor may argue permissible inferences from the evidence)

*b.  Vouching for Credibility of Police Investigators*

---

[5]Some cases referring to only the first type of comment as "vouching" and describe the second type of comment as "bolstering." *See Francis*, 170 F.3d at 551.

Petitioner next contends that the prosecutor improperly vouched for the credibility of the police investigators.  During her closing argument, the prosecutor detailed the investigative work performed by the police in petitioner's case, *see* Trial Tr., Vol. VI, at 41-43, and by the police experts, *see id*. at 44-45.  During rebuttal, the prosecutor, responding to defense counsel's closing argument, stated:

> The police work in this case was exemplary – it was exhaustive.  Defense tries to attack Detective Courtney as somehow being arrogant – somebody who got up in the middle of the night, climbs into the dumpster in the early morning hours, looking for evidence that – would have been evidence that would exonerate him if she found any evidence of the picture frame, of that picture on any thing else in that dumpster.  Is that arrogance?  No, it's not.  It's good police work.  It's exhaustive police work.

*Id*. at 60-61.

The first two instances of allegedly improper comments cited by petitioner do not constitute improper vouching for the quality of the police work in petitioner's case.  In those comments, the prosecutor merely detailed the investigation which was actually conducted, as reflected in the testimony of the witnesses at trial.  In doing so, the prosecutor did not comment on the quality of the police investigation.  *See* Trial Tr., Vol. VI, at 41-45.  In the third instance identified by petitioner, the prosecutor did state that the police work was "exemplary" and that Detective Courtney did good police work.  However, whether the police "did a good or bad job was not a prejudicially improper subject for passing comment during argument."  *United States v. Montemayor*, 684 F.2d 1118, 1125 (5th Cir. 1982); *see also*, *Stone v. Stinson*, 121 F. Supp. 2d 226, 244 (W.D.N.Y. 2000).  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### c.  *Arguing Facts Not in Evidence*

33

Petitioner also argues that the prosecutor improperly argued facts not in evidence. Specifically, petitioner contends that the prosecutor made several statements during closing argument which were inconsistent with the facts offered at trial.

First, in discussing petitioner's claim to have found the picture frame in the dumpster, the prosecutor argued that the frame "was clean, in good shape, when it was found in the defendant's car.  And it was separated from the frame.  Not bent up at all, no spills, pop stains – anything. Where it is defendant's claim he found it in the dumpster where boxes were being tossed, garbage was being tossed in."  Trial Tr., Vol. VI, at 53.  Petitioner argues that there was no evidence presented at trial regarding the condition of the frame at the time it was found in his trunk. However, the frame was entered into evidence and examined by the jury, and thus the condition of the frame was readily apparent.  Thus, petitioner cannot show that this comment was anything other than a permissible inference from the evidence introduced.  *See Martin v. Foltz*, 773 F.2d 711, 717 (6th Cir. 1985); *United States ex rel. Williams v. Washington*, 913 F. Supp. 1156, 1163 (N.D. Ill. 1995)

Petitioner next challenges the prosecutor's argument with respect to the T-shirt on which was the semen stain which proved to match petitioner's DNA.  In discussing the testing of the shirt, the prosecutor stated that the T-shirt "was something she grabbed and put on that night.  She had wore [sic] it to bed initially.  The defendant had taken it off of her.  She grabbed something to put on after she had laid in bed for quite a long time[.]" Trial Tr., Vol. VI., at 43.  During trial, petitioner argues, the victim testified that she did not remember who removed her shirt.  *See id*., Vol. II, at 27 ("I can't remember if he asked me now to remove my clothing or if he actually did but I remember the clothing coming off.").  While the prosecutor's statement was technically erroneous, petitioner has

34

failed to offer any basis to conclude that this misstatement was prejudicial. There was no question as to the chain of custody, nor any other issue in the case related to who in fact removed the shirt. The prosecutor's sole purpose in making her argument was in establishing how it came to be that the victim was wearing the shirt at the hospital, where it was removed and preserved for DNA testing. Thus, petitioner cannot show that he was denied a fair trial by this misstatement.

Petitioner next takes issue with the prosecutor's summary of Gary Paquette's testimony. Paquette, the victim's cousin, was the first person she called. The prosecutor stated that the victim "was upset and crying when she called him that night." Trial Tr., Vol. VI, at 39. Petitioner correctly argues that Paquette never testified as to the victim's emotional condition at the time of the phone call. He did, however, testify that she was upset and crying in the days immediately following the rape. *See id*., Vol. IV, at 22. Thus, the prosecutor's mischaracterization was only slight, and petitioner has failed to show how this mischaracterization of Paquette's testimony prejudiced him.

Finally, petitioner challenges the prosecutor's characterization of Allison Simons's testimony. The prosecutor argued that Simons, the babysitter, testified that nothing unusual had happened while she was watching the victim's children, and that "essentially she was out in the living room with the kids when Mrs. Riley comes home." Trial Tr., Vol. VI, at 38. Petitioner contends that Simons never testified to this fact at trial. While it is true that Simons did not testify that she was in the living room when the victim came home, this was an immaterial point. Simons did testify that nothing unusual had happened, that the patio door was closed, and that the apartment was clean, *see id*., Vol. II, at 77-79. This was the purpose for which her testimony was recounted by the prosecutor, and petitioner has offered nothing to show that he was prejudiced by the prosecutor's mischaracterization of the testimony on an immaterial point.

35

In short, each of the statements which petitioner presents (other than the statement regarding the picture frame, which was a permissible inference from the evidence) were slight mischaracterizations of the testimony on points which were wholly immaterial to the facts and legal issues in petitioner's case. Thus, they do not rise to the level of prejudicial prosecutorial misconduct warranting habeas relief. *See Cone v. Bell*, 243 F.3d 961, 973 (6th Cir. 2001), *rev'd in part on other grounds*, 535 U.S. 685 (2002); *United States v. Nachamie*, 28 Fed. Appx. 13, 22 (2d Cir. 2001); *United States v. Toomey*, 764 F.2d 678, 681-82 (9th Cir. 1985). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### d.  Shifting Burden of Proof

Finally, petitioner argues that the prosecutor impermissibly shifted the burden of proof when she stated that petitioner "did not bring in any of the other people that he said he saw that night" to support his alibi defense. Trial Tr., Vol. VI, at 53. While it is true that a criminal defendant has no duty to testify or come forward with any evidence, once he does so a prosecutor is permitted to comment on that evidence. Here, the prosecutor's comments were merely "a proper way of arguing that the [petitioner's] argument was mere speculation unsupported by the evidence." *United States v. MMR Corp.*, 907 F.2d 489, 502 (5th Cir. 1990). "The state prosecutor was not suggesting to the jury that the petitioner was obligated to prove his innocence. Rather, [s]he was arguing that the petitioner's . . . testimony was unsupported and not worthy of belief. Thus, the prosecutor's comments did not shift the burden of proof to the defense and did not violate the petitioner's constitutional rights." *March v. Bock*, No. 00-CV-10495, 2003 WL 21488691, at *8 (E.D. Mich. June 12, 2003) (Lawson, J.). Further, any ambiguity that the prosecutor's argument may have created for the jury on the matter of the burden of proof was cured by the trial court's instructions

on the proper burden of proof. *See Scott v. Elo*, 302 F.3d 598, 603-04 (6th Cir. 2002); *Lugo v. Kuhlmann*, 68 F. Supp. 2d 347, 369 (S.D.N.Y. 1999). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

H.     *Pretrial Delay (Claim IV)*

Petitioner next contends that he was denied a fair trial when the state intentionally delayed his arrest for 155 days, in order to gain a tactical advantage. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.     *Clearly Established Law*

The Fifth Amendment provides, in relevant part, that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law[.]" U.S. CONST. amend. V. The Supreme Court has indicated that, although statutes of limitations provide the "'primary guarantee against bringing overly stale criminal charges,'" where preindictment delay is involved "the Due Process Clause has a limited role to play in protecting against oppressive delay." *United States v. Lovasco*, 431 U.S. 783, 789 (1977) (quoting *United States v. Marion*, 404 U.S. 307, 322 (1971)).[6] The Sixth Circuit

> has consistently read *Lovasco* to hold that '[d]ismissal for pre-indictment delay is warranted only when the defendant shows [1] substantial prejudice to his right to a fair trial *and* [2] that the delay was an intentional device by the government to gain a tactical advantage.'

*United States v. Brown*, 959 F.2d 63, 66 (6th Cir. 1992) (quoting *United States v. Brown*, 667 F.2d

---

[6]Although the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy trial," U.S. CONST. amend. VI, this provision only applies after formal charges, i.e., an indictment, is pending. Thus, the Sixth Amendment has no application to cases in which, as here, a defendant complains of preindictment delay. *Lovasco*, 431 U.S. at 788-89; *Marion*, 404 U.S. at 320.

566, 568 (6th Cir. 1982) (per curiam)) (emphasis and alterations in original).

2.    *Analysis*

Petitioner contends that the state intentionally delayed arresting him for 155 days in order to gain a tactical advantage, and that as a result of the state's delay he was deprived of his own memory, the memory of his witnesses, and the ability to conduct an appropriate investigation through counsel. Prior to trial, counsel moved to dismiss the charges. The prosecutor explained that petitioner was arrested on an unrelated charge within three or four days of the rape, and at that time was questioned regarding the crime. Thus, the prosecutor argued, petitioner was well aware that he was under investigation for the crime charged shortly after the crime occurred. Furthermore, the prosecutor stated that the case was not filed until March 1991 because the prosecutor was awaiting the results of the DNA testing and other scientific evidence. *See* Trial Tr., Vol. I, at 69. The trial court denied petitioner's motion. *See id.*

Petitioner has failed to establish either element of the *Lovasco* inquiry. First, other than his own speculation he offers nothing to show that the prosecution improperly delayed bringing charges for the purpose of gaining a tactical advantage. He offers nothing that calls into question the validity of the prosecutor's statement to the trial court that the delay was caused by the need to await the results of scientific testing,[7] an indisputably valid reason to delay brining charges. *See Lovasco*, 431 U.S. at 795 (quotation omitted) ("[I]nvestigative delay is fundamentally unlike delay undertaken by the Government to gain tactical advantage over the accused."); *United States v. Merkosky*, 135 Fed. Appx. 828, 835 (6th Cir. 2005) (six month delay not improper where it was necessitated by need for

---

[7]Importantly, the trial court was permitted to accept the prosecutor's representation as true and made in good faith. *See Lovasco*, 431 U.S. at 796.

38

forensic examination of computers).

Second, petitioner has offered nothing to show that he was prejudiced. Petitioner contends that as a result of the delay he was deprived of various witnesses whom he could not remember, and that those witnesses he could remember themselves could not remember details of the date of the crime. However, petitioner has not identified a single actual witness whose memory was so impaired, nor has he put forth anything to show what these supposed witnesses would have been able to testify about at trial. "'It is well established that a defendant claiming impairment of his defense by delay must show specifically and not by mere conjecture wherein his defense has been impaired. Thus, a mere claim of general inability to reconstruct the events of the period in question is insufficient to establish the requisite prejudice for reversal on denial of due process.'" *United States v. Gomez-Pizarro*, 364 F. Supp. 2d 56, 65 (D.P.R. 2005) (quoting *United States v. Golden*, 436 F.2d 941, 943 (8th Cir. 1971)); *see also*, *United States v. Talbot*, 51 F.3d 183, 185 (9th Cir. 1995) ("In demonstrating actual prejudice, the defendant's burden is a heavy one: the proof must be definite and not speculative, and the defendant must demonstrate how the loss of a witness and/or evidence is prejudicial to his case."); *United States v. Doerr*, 886 F.2d 944, 964 (7th Cir. 1989). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

I.     *Cumulative Error (Claim V)*

Finally, petitioner contends that he was denied a fair trial by the cumulative effect of the errors at his trial. The Court should conclude that petitioner is not entitled to habeas relief on this basis. It is true that "[e]rrors which standing alone may be deemed harmless or insufficiently prejudicial to amount to a denial of due process may cumulatively produce a trial setting which is

fundamentally unfair." *Payne v. Janasz*, 711 F.2d 1305, 1316 (6th Cir. 1983) (Jones, J., dissenting); *accord Walker v. Engle*, 703 F.2d 959, 968 (6th Cir. 1983). This rule, however, applies only to constitutional errors; the accumulation of non-errors cannot collectively amount to a violation of due process. *See Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002); *United States v. Lumpkin*, 192 F.3d 280, 290 (2d Cir. 1999); *McKinnon v. Ohio*, No. 94-4256, 1995 WL 570918, at *12 (6th Cir. Sept. 27, 1995); *Fero v. Kerby*, 39 F.3d 1462, 1475 (10th Cir. 1994). As noted and discussed in this Report, none of petitioner's claims establish constitutional error, and thus his cumulative error claim fails.

J.   *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolutions of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.   NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit*

*Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR

72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

   Within ten (10) days of service of any objecting party's timely filed objections, the opposing

party may file a response.  The response shall be not more than five (5) pages in length unless by

motion and order such page limit is extended by the Court.  The response shall address specifically,

and in the same order raised, each issue contained within the objections.


         s/Paul J. Komives      
         PAUL J. KOMIVES
         UNITED STATES MAGISTRATE JUDGE

Dated: <u>9/1/05</u>

| |
|---|
| The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on September 1, 2005.<br><br>      s/Eddrey Butts   <br>      Case Manager |

41